**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY FOSTER, | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | |
| | Civil Action |
| v. | |
| | No. 20-4415  (KMW-MJS) |
| KENNEDY UNIVERSITY HOSPITAL, INC. *d/b/a* JEFFERSON HEALTH-NEW JERSEY, *et al.*, | |
| | **OPINION** |
| Defendants. | |

APPEARANCES:

Daniel T. Silverman, Esquire
Costello & Mains PC
18000 Horizon Way Suite 800
Mt. Laurel, NJ 08054
        Counsel for Plaintiff Amy Foster

Eric B. Meyer, Esquire
FisherBroyles, LLP
One Liberty Place
1650 Market Street
Philadelphia, PA 19103
        Counsel for Defendants Kennedy University Hospital, Inc. d/b/a/ Jefferson
        Health-New Jersey & Jefferson Cherry Hill Hospital

**WILLIAMS, District Judge**

**I. INTRODUCTION**

In this Family and Medical Leave Act  ("FMLA") retaliation and employment disability

discrimination action, Plaintiff Amy Foster ("Plaintiff"), brings suit against Defendants Kennedy

University Hospital, Inc., d/b/a Jefferson Health – New Jersey and Jefferson Cherry Hill Hospital

(collectively, "Defendants"), her former employer, claiming that Defendants interfered with her

rights under the FMLA, retaliated against her for utilizing her rights under the FMLA, and further discriminated against her for using FMLA leave in violation of the New Jersey Law Against Discrimination ("NJLAD"). For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion for Summary Judgment.

## II. BACKGROUND

### A. Factual Background

On May 4, 2009, Plaintiff began her employment with Defendants as a full-time Registered Nurse in the T-1 Department. Defs. Statement of Material Facts, ECF No. 41-5, at ¶ 1. In 2016, Margaret Rosso ("Rosso") was hired as a Nurse Manager in Defendants' Cherry Hill location, and around January of 2019, Rosso became Plaintiff's direct supervisor. *Id.* at ¶¶ 3-4.

Defendants use Absolve Leave Administration ("AbSolve"), a third party, to handle FMLA-related requests, including approving requests for FMLA leave. *Id.* at ¶ 12. AbSolve does not share information regarding the basis for an employee's FMLA leave with Defendants. *Id.* at ¶ 13. In 2017, AbSolve approved Plaintiff for intermittent leave from August 28, 2017 through February 28, 2018 under the FMLA connected with her Ehlers-Danos Syndrome diagnosis. *Id.* at ¶ 14. From November 25, 2018, until March 4, 2019, Plaintiff took approved leave, covered in part by the FMLA and in part by accommodative leave. *Id.* at ¶ 16. Additionally, in early May 2019, Plaintiff missed two days of work for Cataract surgery, but did not seek FMLA leave for this absence. *Id.* at ¶¶ 17-18.

Prior to taking FMLA and accommodative leave, Plaintiff's record of unsatisfactory work performance dates back to August 5, 2009, and she was issued a series of written warnings and Doc Counseling sessions for numerous issues spanning eight years. *Id.* at ¶ 32. Between May

2019 and October 2019, Plaintiff was involved in three incidents that lead to her eventual termination.

Around April 25, 2019, Charge Nurse Webster reported to Rosso that Plaintiff had applied socks to a patient's hands and secured the socks with tape, which Plaintiff had wrapped around each wrist, with a second sock also secured with tape overtop each hand (the "Patient Restraint Incident"). *Id.* at ¶ 34. Plaintiff disputes that she was the person who applied the socks to the patient's hands, as well as whether this conduct had violated the Restraints and Seclusion Policy. Pltf. Response to Defs. SMF, ECF No. 44, at ¶¶ 38-39; Pltf. Statement of Material Facts, ECF No. 44 at ¶¶ 7-10. On May 14, 2019, Rosso issued Plaintiff a written warning for violating the Restraint and Seclusion Policy. Defs. SMF, at ¶ 47.

On August 5, 2019, Rosso received an email with a subject line "AMY FOSTER KH108358 Intermittent O FMLA day-8/5/19-Approved"; however, Defendants dispute that Rosso actually read this email. Defs. Response to Pltf. Clarification to SMF, ECF No. 55, at ¶ 13.

On September 17, 2019, Plaintiff was the subject of another write-up for failing to provide translation services through a double sided phone for translation referred to as a "language line" to a Korean-speaking patient (the "Patient Rights Incident"). Defs. SMF, at ¶¶ 59, 65. Plaintiff said she offered the patient a language line, but the patient refused to use the phone. *Id.* at ¶¶ 76-78. When asked about the Patient Rights Incident, Plaintiff told Rosso she believed the patient could understand her because the patient had stated on a previous day that they needed "the potty," and "needed a new diaper." *Id.* at ¶ 85. Plaintiff did not offer any other interpretive services to the patient, did not attempt to contact the patient's family to help interpret, or take any other steps to ensure the patient knew the importance of using the language line phone to understand and consent

to the care being provided. *Id.* at ¶¶ 81, 83-85. However, when Rosso observed the patient for treatment, she needed a live interpreter to effectively communicate with the patient and ultimately concluded the patient had little comprehension of the care being provided to her during her stay and needed language services to understand. *Id.* at ¶¶ 87-88. After an investigation, Defendants determined the patient could not adequately understand enough English to be able to refuse language services. *Id.* at ¶ 89. On September 30, 2019, Rosso emailed Jennifer Knopple, Jefferson's Human Resources Business Partner, and Frank Rocco, the Corporate Director of Nursing, a summary of the Patient Rights Incident, with the recommendation of proceeding with a Level 1 Suspension in accordance with the second level of the progressive corrective action plan; the email also noted Plaintiff's long history of unsatisfactory work performance and the Patient Restraint Incident earlier in May of 2019. *Id.* at ¶¶ 91-92. On October 1, 2019, Knopple prepared an investigation report for the Patient Rights incident, including a recommendation of a Level 1 Suspension in accordance with the progressive disciplinary action plan. *Id.* at ¶ 93. Rocco reviewed Knopple's investigation report and agreed with the recommendation to suspend Plaintiff, and Julie Ellis, an Assistant VP within the Human Resources department, and Knopple's supervisor, also approved the suspension. *Id.* at ¶¶ 94-95. Plaintiff was then suspended for two full-shifts for violating the Patient Rights and Responsibilities Policy and the Effective Communication Policy. *Id.* at ¶ 96.

On October 15, 2019, Plaintiff received a letter from AbSolve concerning her "leave designation notice," which indicated, among other things, that the status of her intermittent leave is from "10/8/2019 to 4/8/2020, twice every 2 months for 1 day." Pltf.'s Clarification re SMF, ECF No. 52, Exhibit J. The letter further states that a copy "has been provided to Kennedy's

Human Resources Department." *Id.*

On October 17, 2019, after Plaintiff had been caring for a patient, the patient complained that Plaintiff (1) did not attend to the patient and took a long time to respond to the call light; (2) administered morphine without the patient's consent; (3) after the patient asked for Vistaril for his anxiety stemming from a history of PTSD, Plaintiff told him about her own history of PTSD; (4) instructed the patient's visitor to monitor the patient to see if he had a bad reaction to the medicine; and (5) refused to remove a painful IV access (the "Patient Complaint Incident"). Defs. SMF, at ¶ 99. Additionally, it is disputed whether Plaintiff failed to record the patient's home medication or the Vistaril for his anxiety. Pltf. Response to Defs. SMF, at ¶ 102. Plaintiff claims the patient misunderstood her instruction for the visitor to monitor the patient and explained that she meant she would still be checking in on him, but if he needed anything, then his visitor should come and get her. *Id.* at ¶ 134.

On October 21, 2019, Defendants suspended Plaintiff pending investigation into the Patient Complaint Incident. Defs. SMF, at ¶ 116. On October 22, 2019, Plaintiff emailed Defendants indicating that she sought to resign from her position. *Id.* at ¶ 117. On or about October 22, 2019, Knopple communicated to Plaintiff that Defendants would not accept her resignation because the investigation into the Patient Complaint Incident was ongoing. *Id.* at ¶ 120.

After completing the investigation, Knopple concluded Foster violated Policy A-2 Nursing Admission Assessment Record, Guidelines for Completion. *Id.* at ¶ 124. On November 6, 2019, Knopple emailed the investigation report to Rocco and Rosso, which Rocco then forwarded to his supervisor Autum Shingler-Nace, Assistant Vice President of Clinical Services. *Id.* at ¶¶ 125-126. Rocco and Shingler-Nace reviewed the investigation report and recommended Jefferson terminate

Plaintiff's employment.  *Id.* at ¶ 127.  After being sent the investigation report, Ellis approved Plaintiff's termination.  *Id.* at ¶¶ 128-129.  On November 8, 2019, Defendants terminated Plaintiff. *Id.* at ¶ 130.

### B. Procedural Background

On March 4, 2020, Plaintiff initiated this action in the Superior Court of New Jersey, Law Division, Camden County, asserting claims under the FMLA and the NJLAD.  Notice of Removal, ECF No. 1.  On April 16, 2020, Plaintiff filed the First Amended Complaint in the state court action.  *Id.*  The next day, on April 17, 2020, Defendants removed this action to the United States District Court for the District of New Jersey.  *Id.*

Following the completion of discovery, on October 18, 2021, Defendants filed a Motion for Summary Judgment (ECF No. 41).  Defendants included in the Motion a Statement of Material Facts Not in Dispute ("Defs. SMF") (ECF No. 41-5).  On November 12, 2021, Plaintiff filed an Opposition to Defendants' Motion (ECF No. 44).  In the Opposition, Plaintiff responded to the statements made within Defs. SMF, and filed her own Further Statement of Material Facts ("Pltf. SMF").  On November 29, 2021, Defendants filed a Reply to Plaintiff's Opposition (ECF No. 45), in which Defendants responded to Pltf. SMF.

On June 17, 2022, after the Court found errors within the original filing and provided Plaintiff an opportunity to correct the mistakes, Plaintiff filed a Clarification as to Response to Defendants' Statement of Material Facts and Plaintiff's Further Statement of Material Facts (ECF No. 52).  Additionally, Defendants filed a Response to Plaintiff's Clarification to Plaintiff's Further Statement of Material Facts (ECF No. 55).

On July 21, 2022, the Court held oral argument.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. DISCUSSION

### A. Claims under the Family Medical Leave Act ("FMLA")

"The purposes of the Family [and] Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Petras v. IAP Worldwide Servs., Inc.*, No. CIV.A. 07-170, 2008 WL 5395750, at \*11 (D.N.J. Dec. 23, 2008) (quoting 29 U.S.C. § 2601(b)(1) and (2)). To that end, the FMLA was enacted to provide up to twelve weeks of leave for workers whose personal or medical circumstances necessitate that they take time off from work in excess of what their employers are willing to provide. 29 U.S.C. § 2601, *et seq.*; *see also Victorelli v. Shadyside Hops.*, 128 F.3d 184, 186 (3d Cir. 1997) (citing 29 C.F.R. §825.101). To protect an employee's rights under the FMLA, employers are prohibited from engaging in certain actions. First, section 2615(a)(1) makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." *Id.* at § 2615(a)(1) (a so-called "interference" claim). Second, section 2615(b) makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." *Id.* at § 2615(b) (a so-called "retaliation" claim). As Plaintiff asserts claims under both theories, the Court will address these claims in turn.

### a. FMLA Interference Claim

"Interference claims are 'based on the prescriptive sections of the FMLA which create substantive rights for eligible employees.'" *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 525-26 (D.N.J. 2008) (quoting *Parker v. Hahnemann Univ. Hosp.*, 234 F.Supp.2d 478, 485 (D.N.J. 2002)). As this district explained in *Thurston*, "[a]n interference claim is 'not about discrimination'

and therefore, a burden-shifting analysis, such as that which courts employ under *McDonnell Douglas* and its progeny [in employment discrimination cases], is not required." *Id.* (quoting *Callison v. City of Phila.,* No. 03–3008, 2004 WL 765479, at *3-4 (E.D.Pa. Mar. 31, 2004)). Rather, "these prescriptive rights 'set floors for employer conduct.'" *Id.* (quoting *Parker,* 234 F.Supp.2d at 485).

To prevail on an FMLA interference claim, the employee merely needs to show she was entitled to benefits under the FMLA and that she was denied them. *Parker,* 234 F.Supp.2d at 485. She does not need to show that the employer treated other employees more or less favorably, and the employer cannot excuse its action by offering a legitimate business reason as justification. *Id.* (citing *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir. 1998)). This action is merely about whether the employer provided its employee the entitlements and protections guaranteed by the FMLA. *Id.*

The Third Circuit has held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).  For the reasons set forth more fully in the next section, there exists an issue of material fact concerning whether Defendants interfered with Plaintiff's use of her FMLA leave when she was terminated. Therefore, the Court will **DENY** Defendants' Motion for Summary Judgment with respect to Plaintiff's FMLA interference claim.

b.  FMLA Retaliation Claim

As previously noted, the FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice

made unlawful by this subchapter." 29 U.S.C.A. § 2615(a)(2) (West). Courts in this district apply

the three-step *McDonnell Douglas* burden-shifting framework, used in various other employment

discrimination contexts, to FMLA retaliation claims. *Dieng v. Computer Sci. Corp.*, No. 14–5381,

2016 WL 885389, at *10 (D.N.J. Mar. 8, 2016); *Parker*, 234 F.Supp.2d at 488 (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973)). The Supreme Court has summarized the

framework as follows:

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for
> discriminatory-treatment cases. Under *McDonnell Douglas*, a plaintiff must first
> establish a prima facie case of discrimination. The burden then shifts to the
> employer to articulate a legitimate, nondiscriminatory reason for its employment
> action. If the employer meets this burden, the presumption of intentional
> discrimination disappears, but the plaintiff can still prove disparate treatment by,
> for instance, offering evidence demonstrating that the employer's explanation is
> pretextual.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) (citations omitted).

i. Prima Facie Case

To establish a prima facie case for retaliation, "'a plaintiff must demonstrate that: (1) he or

she is protected under the FMLA, (2) he or she suffered an adverse employment action, and (3) the

adverse action was causally related to the plaintiff's exercise of his or her [protected leave] rights.'"

*Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) (quoting district court below)

(internal quotations omitted). The parties do not dispute that Plaintiff engaged in a protected

activity under the FMLA, and therefore, this Court will only address the remaining two elements

of Plaintiff's FMLA retaliation claim.

*1. Adverse Employment Action*

Once a plaintiff has established that he or she was engaged in an activity protected under

the FMLA, the court must next determine whether the plaintiff suffered an adverse employment

action.  For a Title VII retaliation claim, an "adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Davis v. City of Newark,* 285 F. App'x 899, 904 (3d Cir.2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  Put another way, "[a]n actionable adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a significant change in benefits.'" *Betts v. Summit Oaks Hosp.*, 687 F. App'x 206, 207 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  "[S]omething less than a discharge could be an adverse employment action." *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999).  While "'petty slights, minor annoyances, and simple lack of good manners will not create such deterrence [to establish an adverse employment action] . . . retaliation is actionable only where it produces material injury or harm sufficient to deter opposition to or reporting of discriminatory employment practices.'" *Nepomuceno v. Astellas US LLC*, No. CIV. 11-4532 FSH, 2013 WL 3746143, at *4 (D.N.J. July 9, 2013) (quoting *Alers v. City of Philadelphia,* CIV.A. 08-4745, 2013 WL 300747, *8 (E.D.Pa. Jan. 24, 2013)).  Plaintiff asserts that she was subjected to the following adverse employment actions to warrant her retaliation claim: a May 2019 written warning, a suspension on October 1, 2019, a suspension on October 21, 2019, and her eventual termination on November 8, 2019.

First, the written warning Plaintiff received on May 14, 2019 is not an adverse employment action to support an FMLA retaliation claim. Defs. SMF, at ¶ 46.  For a plaintiff to establish specific conduct as an adverse employment action, it "must be 'sufficiently severe as to alter the employee's compensation, terms, conditions, or privileges of employment, or to deprive or tend to

11

deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Davis v. City of Newark*, 285 F. App'x 899, 903-04 (3d Cir. 2008) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1296–97 (3d Cir.1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)); *see Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (explaining that the conduct must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment"). A written warning that does not result in any material change in the terms or conditions of a plaintiff's employment cannot be considered an adverse employment action for purposes of a plaintiff's prima facie case of retaliation. *Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 446-47 (3d Cir. 2011); *see Dooley v. Roche Lab'ys, Inc.*, No. CIV. 04-2276 (GEB), 2007 WL 556885, at *10 (D.N.J. Feb. 15, 2007), *aff'd sub nom. Dooley v. Roche Lab Inc.*, 275 F. App'x 162 (3d Cir. 2008) (finding that "a written warning which does not result in any material change to Plaintiff's employment (pay or status) is insufficient to constitute an adverse employment action"). Here, Plaintiff does not point to any facts establishing that the May 14, 2019 written warning resulted in any material change to her employment or that her employment was impacted, adversely or otherwise, by the warning and thus such conduct does not constitute an adverse employment action to support an FMLA retaliation claim. *See id.*; *see also Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 447 (3d Cir. 2011) (explaining that "to constitute an adverse employment action, the letters [of reprimand] had to have effected a material change in the terms or conditions of [the plaintiff's] employment").

Next, Plaintiff has established she suffered an adverse employment action when she was suspended without pay on October 1, 2019 and October 21, 2019. This district has found that

suspensions often constitute adverse employment actions in the employment discrimination context. *See Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 423 (D.N.J. 2003) (stating that "there can be little dispute that the five-day suspension Plaintiff received . . . constituted the type of tangible, 'adverse employment action' contemplated by Title VII and the NJLAD") (citing *Gharzouzi v. Northwestern Human Services of Pennsylvania,* 225 F.Supp.2d 514, 541 (E.D.Pa. 2002)).  Here, Plaintiff was suspended on two occasions, both times without pay, and therefore was subject to an adverse employment action on each occasion.  Finally, Plaintiff's November 8, 2019 termination constituted an adverse employment action.  It is well-established that termination is an adverse action in employment discrimination cases.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (noting the plaintiff "clearly suffered a materially adverse action, since she was terminated from her job"); *see also Betts*, 687 F. App'x at 207 (explaining that an actionable adverse employment action includes firing) (citing *Burlington Indus., Inc.*, 524 U.S. at 761).  However, the Third Circuit has also established that "[v]oluntary resignation is not an adverse employment action."  *Larochelle v. Wilmac Corporation*, 769 F. App'x 57, 60 (3d Cir. 2019) (citations omitted).

Here, the timeline of events is particularly important to determine what, if any, adverse employment action Plaintiff suffered after the Patient Complaint Incident.  In response to the incident, on October 21, 2019, Plaintiff was suspended pending further investigation into the events.  As previously discussed, the October 21st suspension without pay was an adverse employment action.  *See Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d at 471.  On October 22, 2019, the day after Plaintiff was suspended pending the investigation, Plaintiff attempted to tender her resignation.  Defs. SMF, at ¶ 117.  However, Knopple refused to accept this resignation, indicating

that the resignation could not be accepted given the pending investigation. *Id.* at ¶ 120. On November 6, 2019, Knopple distributed the Investigation Report concerning Plaintiff's conduct to various decision makers at Jefferson. *Id.* at ¶¶ 125-128. Then, on November 8, 2019, Plaintiff was terminated. *Id.* at ¶ 130. Although voluntary resignation typically precludes an assertion of an adverse employment action, here, Plaintiff's voluntary resignation was refused and rejected by Knopple.[1]   The Court acknowledges that these specific circumstances are unique, and finds guidance in cases wherein an employer, after accepting an employee's voluntary resignation, refuses to accept that same employee's recission of their resignation. In those situations, courts have found that a refusal to accept an employee's recission of a voluntary resignation does not constitute an adverse employment action, emphasizing that at the time of the attempted rescission, there is no employment relationship between the employer and the resigned employee. *See Schofield v. Metro. Life Ins. Co.*, No. 3:CV-03-0357, 2006 WL 2660704, at *9 (M.D. Pa. Sept. 15, 2006), *aff'd*, 252 F. App'x 500 (3d Cir. 2007) (finding the employer did not act improperly when it refused to accept the plaintiff's rescission of his voluntary resignation and finding that "[f]ailure to accept a previous employee's rescission of his voluntary resignation is not an adverse employment action for the simple reason that the employment relationship has ended") (citation omitted). This case presents distinguishable circumstances because Knopple refused to accept Plaintiff's resignation, ultimately voiding the attempted resignation, and preserving the employment relationship up until Plaintiff's termination. Thus, Plaintiff's attempted resignation does not impact the eventual termination, and moreover, that termination constitutes an actionable adverse employment action.

---

[1] Defendants having refused Plaintiff's resignation cannot now rely on the same to obfuscate that adverse action it took after said refusal.

Because Plaintiff was subject to adverse actions when she was suspended without pay on October 1st and October 21st, as well as when she was ultimately terminated on November 8, 2019, the Court will address the third and final element of a prima facie claim for retaliation under the FMLA.

### 2. *Causal Relationship*

For the third and final element of the prima facie case, this Court must consider whether Plaintiff has sufficiently established that she suffered these adverse employment actions *because* she engaged in protected activity, *i.e.*, because she requested and utilized her FMLA leave. "[T]he Third Circuit has emphasized that when analyzing whether a plaintiff has established causation in a retaliation case, a court should view the entire record, and ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Thurston*, 941 F. Supp. 2d at 532 (quoting *Farrell v. Planters Lifesavers Company,* 206 F.3d 271, 280 (3d Cir. 2000)). "Generally, to demonstrate a causal connection, a plaintiff must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 233 (D.N.J. 2015) (quoting *Budhun v. Reading Hosp. and Med. Ctr.,* 765 F.3d 245 (3d Cir. 2014)). However, the Third Circuit has explained that courts can consider a variety of evidence to determine whether this causal connection has been made, including the temporal proximity between the protected activity and the adverse action, a pattern of antagonism, inconsistent reasoning for the adverse employment action, among other types of evidence. *See Farrell v. Planters Lifesavers Company,* 206 F.3d 271, 280-87 (3d Cir. 2000). Additionally, the Court is required to review the evidence in the light most favorable to Plaintiff, the non-moving

party, and should draw inferences in Plaintiff's favor at this procedural stage. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284-85 (3d Cir. 2000) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 164 (3d Cir. 1999)).

Here, there is an issue of material fact concerning the temporal proximity. Plaintiff identifies two pivotal dates when she engaged in protected activity and used or requested FMLA leave – August 5, 2019 and October 8, 2019. Pltf.' SMF, ECF No. 45, at ¶ 13; Pltf.'s Clarification re SMF, ECF No. 52, at ¶ 14. Plaintiff was then subject to adverse employment actions of suspensions on October 1, 2019 and October 21, 2019, as well as her termination on November 8, 2019. Defs. SMF, at ¶¶ 96, 116, 130. The Third Circuit has noted that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citing *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). The Third Circuit in *Moore v. City of Philadelphia* further explained that "to the extent [the plaintiff] relies upon the brevity of the time periods between the protected activity and the alleged retaliatory actions to prove causation, he will have to show as well that the decision maker had knowledge of the protected activity." 461 F.3d 331, 351 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (internal citations omitted). The requirement established in *Moore* is particularly crucial here, where there exist disputes concerning who knew what with respect to Plaintiff's FMLA leave. Pltf.'s Reply to Defs. SMF, ECF No. 44, at ¶¶ 19-31. Therefore, there is an issue of material fact concerning the causal connection element of Plaintiff's prima facie retaliation claim.

16

    ii.  <u>Employer's legitimate, nondiscriminatory reason for suspensions and termination</u>

Defendants have countered Plaintiff's prima facie case by asserting that Plaintiff's conduct with respect to the various incidents violated Defendants' policies and therefore warranted the employment actions of the two suspensions and eventual termination.  Because Defendants have articulated legitimate, nondiscriminatory reasons for Plaintiff's suspensions and termination, the burden returns to Plaintiff to demonstrate Defendants' reasons were merely pretext and this Court must consider the third prong of the *McDonnell Douglas* analysis.

    iii.  <u>Pretext</u>

At the third phase of analysis, the Court must assess whether the plaintiff can demonstrate that the employer's legitimate reason for termination is a mere pretext for actual retaliation.  For Defendants to obtain summary judgment at this stage, Defendants are required to show that Plaintiff could not raise an issue of fact that might show that the Defendants' explanation was pretextual.  *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989).  Likewise, "[t]he Plaintiff's burden on summary judgment is to 'point to some evidence,' *direct or circumstantial,* from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Constant v. Mellon Financial Corporation,* 247 F. App'x 332, 337-38 (3d Cir. 2007) (emphasis added) (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).  The Court takes this opportunity to note that the evidence of Defendant's legitimate reason for suspending and terminating Plaintiff is strong.  Indeed, Plaintiff faces a seemingly insurmountable evidentiary hurdle to demonstrate to a reasonable jury that her termination based on recorded treatment of patients was merely pretextual.  However, the Third

Circuit has explained that determinations of discrimination inherently rely on an examination of intent, which is best left to the jury. *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1071-72 (3d Cir. 1996) ("The role of determining whether the inference of discrimination is warranted must remain within the province of the jury, because a finding of discrimination is at bottom a determination of intent."); *see also Thurston,* 941 F. Supp. 2d at 534 FN 10 (D.N.J. 2008) ("The determination of whether the reason given was pretextual should be left for the jury because a 'finding of discrimination is at bottom a determination of intent.'").

The Third Circuit has recognized that courts often consider the same behavior when analyzing the causation element of a prima facie case and the examination of pretext as part of the *McDonnell Douglas* process, and by nature, the discussions of causation and pretext can overlap. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000). Here, as noted in the discussion of the causation element of a prima facie case, there exist issues of material fact concerning who knew what about Plaintiff's FMLA leave and when these individuals knew about it. *See* infra. Importantly, it is undisputed that Rosso received an email on August 5, 2019 with a subject line "AMY FOSTER KH108358 Intermittent O FMLA day-8/5/19-Approved"; however, Defendants dispute that Rosso actually read this email. Defs. Response to Pltf. Clarification to SMF, ECF No. 55, at ¶ 13. Further, Plaintiff provided a letter from AbSolve evincing her approved FMLA leave, including intermittent leave from "10/8/2019 to 4/8/2020, twice every 2 months for 1 day," which AbSolve said it "provided to Kennedy's Human Resources Department." Pltf.'s Clarification re SMF, ECF No. 52, Exhibit J. Additionally, Plaintiff presents facts to support her conduct and to question whether the consequences she was subjected to were in fact appropriate. For instance, with respect to the Patient Rights Incident, Plaintiff testified that she had

18

communicated with the patient and believed the patient could understand English, Pltf. Response

to Defs. SMF, at ¶¶ 82, 90.  Therefore, the Court will **DENY** Defendants' Motion for Summary

Judgment with respect to Plaintiff's FMLA retaliation claim.  Moreover, because there exist issues

of material fact related to whether Defendants interfered with Plaintiff's rights under the FMLA,

the Court will also **DENY** Defendants' Motion for Summary Judgment with respect to Plaintiff's

FMLA interference claim.

### B. Claims under the New Jersey Law Against Discrimination ("NJLAD")

"The NJLAD was enacted with the express purpose of protecting civil rights, particularly

in the area of employment discrimination, where the NJLAD declares that the opportunity to gain

employment without fear of discrimination is a civil right." *Thurston*, 941 F. Supp. 2d at 534

(citing *Viscik v. Fowler Equip. Co., Inc.,* 173 N.J. 1, 16, 800 A.2d 826 (2002)).  When examining

claims brought under the NJLAD, courts will often look to federal law dealing with civil rights

and employment discrimination.  *See Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 498 (3d Cir.

1999) (explaining that the analysis of claims made pursuant to the NJLAD generally follow the

analysis of Title VII claims); *Mancini v. Township of Teaneck,* 349 N.J.Super. 527, 564, 794 A.2d

185 (App.Div.2002) (observing that trial court "properly looked to federal law dealing with Title

VII and Civil Rights legislation to determine what constituted an adverse employment action in

the context of a LAD retaliation claim").  Moreover, in analyzing claims under the NJLAD, the

New Jersey Supreme Court has adopted the analysis outlined by the U.S. Supreme Court in

*McDonnell Douglas* as discussed above.  *See Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 446

A.2d 486 (1982); *Thurston*, 941 F. Supp. 2d at 535; *see also Petras v. IAP Worldwide Servs., Inc.*,

No. CIV.A. 07-170, 2008 WL 5395750, at *6 (D.N.J. Dec. 23, 2008) (explaining that "[t]he

19

framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs Title VII claims, and, by extension, claims under the NJLAD"). This Court will thus use that process in analyzing Plaintiff's NJLAD claims below. In the Amended Complaint, Plaintiff asserts three claims under the NJ LAD, including claims for discrimination both for a disability and a perceived disability, and a claim for retaliation.

    a.  NJLAD Discrimination Claim

In line with the *McDonald Douglas* analysis noted above, the first step in addressing an NJLAD discrimination claim is to determine whether the plaintiff has established a prima facie case. To meet the prima facie burden in a disability discrimination action under the NJLAD, an employee must show that: (1) he or she has a disability or is perceived by the employer as disabled; (2) he or she was qualified for the position from which he or she was discharged; (3) he or she has suffered an adverse employment action because of that disability; and (4) the employer sought someone else to do the same work. *Deane v. Pocono Medical Center,* 142 F.3d 138, 142-44 (3d Cir. 1998). "New Jersey courts have long recognized a discrimination claim for those who are not disabled but are perceived to be disabled under the NJLAD." *Thurston,* 941 F. Supp. 2d at 534-35 (citing *Olson v. General Electric Astrospace,* 966 F.Supp. 312, 316 (D.N.J. 1997)). "To state a claim for perceived handicap discrimination under the NJLAD, the Plaintiff must allege facts showing that Defendant perceived the Plaintiff as having a physical or mental condition that would qualify as disabled under the NJLAD." *Id.* at 535 (citation omitted). When considering whether a plaintiff has established a prima facie case, the Third Circuit has noted that "[t]he evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination *could* be a reason for the

employer's action. As we have held on numerous occasions, this initial burden 'is not intended to be onerous.'" *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996) (collecting cases).

Here, Plaintiff suffers from Ehlers-Danlos syndrome, which Plaintiff asserts makes her disabled under the NJLAD. *See Stowell v. Black Horse Pike Reg'l Sch. Dist.*, No. CV1706633RBKAMD, 2019 WL 6044937, at *7 (D.N.J. Nov. 15, 2019) ("The NJLAD's conception of disability 'is very broad and does not require that a disability restrict any major life activities to any degree.'") (quoting *Enriquez v. West Jersey Health Sys.*, 342 N.J. Super. 501 (N.J. Super. Ct. App. Div. 2001)); *see also* N.J. Stat. Ann. § 10:5–5(q) (defining "disability"). Accordingly, Plaintiff has brought claims for disability discrimination and perception of disability discrimination.  The Third Circuit has explained that "[c]ourts considering claims under the NJLAD [. . .] look to the case law interpreting the Americans with Disabilities Act ("ADA") for guidance." *Johnson v. Thru Point, Inc.*, 160 F. App'x 159, 161–62 (3d Cir. 2005) (citing *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 956 (3d Cir. 1996)).  Moreover, "[u]nder the ADA, an employee complaining of discrimination because of a disability must be able to show that the employer was on notice of the disability." *Id.* at 162 (citing *Jones v. UPS,* 214 F.3d 402, 408 (3d Cir. 2000)); *see also Stowell v. Black Horse Pike Reg'l Sch. Dist.*, No. CV1706633RBKAMD, 2019 WL 6044937, at *7 (D.N.J. Nov. 15, 2019) (finding that the record contained sufficient evidence for a jury to conclude that the plaintiff was "suffering from a disability of which the [defendant] was aware" after the plaintiff presented undisputed facts that the plaintiff had spoken to his supervisor about his medical condition and the defendant knew about the plaintiff's eventual surgery) (citations omitted).  Here, however, Plaintiff does not provide evidence that her

supervisors knew about her medical condition. Specifically, it is not disputed that "Neither Rosso nor any other member of Jefferson's management team knew that Foster had Ehlers-Danlos Syndrome." Defs. SMF, at ¶ 28. It is also not disputed that "by January 29, 2019, Rosso knew that Foster had taken medical leave although she did not know the medical basis for the leave – and specifically did not know that Foster had taken leave specifically for Tenosynovitis (or that she claims to suffer from Tenosynovitis." Defs. SMF, at ¶ 29. Even though there appears to be a disputed fact concerning whether Plaintiff's co-worker, Webster, knew about her Ehlers-Danlos Syndrome because Plaintiff discussed her FMLA request with Webster, Webster's only connection with Plaintiff's supervisors and management (in connection with this case) was to report certain patient incidents. Pltf. SMF, at ¶ 22 (wherein Plaintiff asserts that Webster provided data and information that Defendant relied upon in issuing discipline, citing to Defendants' SMF). Additionally, Plaintiff disputes that Knopple, a member of Defendants' HR Department had knowledge of her condition, citing the fact that Plaintiff discussed her FMLA leave with Knopple and the fact that Knopple had access to Plaintiff's personnel file. Pltf.'s Reply to Defs. SMF, ECF No. 44, at ¶¶ 22, 26. Crucially, however, Plaintiff does not cite to actual evidence to establish Knopple's knowledge of her medical condition. Therefore, the Court will **GRANT** Defendants' Motion for Summary Judgment with respect to Plaintiff's NJLAD actual disability discrimination claim.

As previously noted, "New Jersey courts have long recognized a discrimination claim for those who are not disabled but are perceived to be disabled under the NJLAD." *Thurston*, 941 F. Supp. 2d at 534-35 (citing *Olson v. General Electric Astrospace,* 966 F.Supp. 312, 316 (D.N.J. 1997)). "To state a claim for perceived handicap discrimination under the NJLAD, the Plaintiff

must allege facts showing that Defendant perceived the Plaintiff as having a physical or mental condition that would qualify as disabled under the NJLAD." *Id.* at 535 (citation omitted). In *Thurston*, this district rejected a Plaintiff's claim for an NJLAD perceived disability claim when the plaintiff's only support for her claim/that her employer perceived her as disabled was that she took medical leave and the defendant was "well aware" that she would be getting therapy for an indefinite and unspecified period of time. *Id.* at 536. The district court further noted that "to survive a motion for summary judgment, a non-moving party must do more than rely only 'upon bare assertions, conclusory allegations or suspicions.'" *Id.* (quoting *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted)). Here, Plaintiff has not established that her exercise of her rights under the FMLA caused Defendants to perceive her as disabled or offered any alternative evidence to support a perception of disability. Therefore, this Court will **GRANT** Defendants' Motion for Summary Judgment with respect to Plaintiff's NJLAD perceived disability discrimination claim.

b. NJLAD Retaliation Claim

The elements of a prima facie NJLAD retaliation claim are the same as for a retaliation claim under the FMLA – a "[p]laintiff must demonstrate by a preponderance of the evidence that (1) she engaged in protected activity—here, a request for a reasonable accommodation; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 239 (D.N.J. 2015). Given the similarities between the analyses for a retaliation claim under the NJLAD and the FMLA, the Court need not repeat the extensive analysis provided above. Therefore, for the reasons set forth in the discussion of Plaintiff's FMLA retaliation claim, the Court will **DENY** Defendants'

Motion for Summary Judgment with respect to Plaintiff's NJLAD retaliation claim.

### V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 41) is hereby **GRANTED IN PART** and **DENIED IN PART**.   An accompanying Order will be entered.

Dated: July 28, 2022

KAREN M. WILLIAMS
United States District Judge